UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

DEAUNDRA PATTERSON,    )
             )
     Plaintiff,   )
             )
    v.      )  No. 2:22-cv-00080-JPH-MG
             )
CENTURION HEALTH SERVICES, et al., )
             )
     Defendants.  )

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Deaundra Patterson, a prisoner who is incarcerated at Wabash Valley

Correctional Facility, alleges that Defendants were deliberately indifferent to his

serious medical conditions, and that one Defendant unlawfully retaliated

against him by denying him needed medical care.  Defendants have filed a

motion for summary judgment, dkt. 62.  For the reasons below, that motion is

**GRANTED IN PART AND DENIED IN PART**.

**I.
Standard of Review**

A motion for summary judgment asks the Court to find that a trial is

unnecessary because there is no genuine dispute as to any material fact and,

instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ.

P. 56(a).  When reviewing a motion for summary judgment, the Court views the

record and draws all reasonable inferences from it in the light most favorable to

the nonmoving party.  *Khungar v. Access Cmty. Health Network*, 985 F.3d 565,

572–73 (7th Cir. 2021).  It cannot weigh evidence or make credibility

determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Patterson and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

## A. The Parties

At all times relevant to the allegations in his complaint, Mr. Patterson was incarcerated at Wabash Valley.  He brings claims against Dr. N. Rajoli, Kim Hobson, Nurse Wolfe, C. Roberts, Dr. Sam Byrd, Nurse Taylor, Nurse Firestone, Nurse Heather Pangallo, Iva Shorter, and Centurion Health of Indiana, LLC.[1]  Centurion became the contracted healthcare services provider for IDOC facilities beginning July 1, 2021.  Dkt. 62 at 1.

Defendants have not designated evidence describing their specific job titles and duties, but the Court understands the following from the record. Defendants Rajoli and Byrd were doctors.  *See* dkt. 61-1 at 5–7; dkt. 61-1 at 11–12.  Defendants Wolfe, Taylor, Firestone, and Pangallo were nurses.  Dkt. 77 at 7–8, 13.  Defendant Hobson was the Health Services Administrator.  Dkt. 44-1 at 9.  Defendant Roberts reviewed health care request forms ("HCRs"), dkt. 44-1 at 34, and Defendant Shorter scheduled appointments with medical providers, dkt. 77 at 176.

## B. Mr. Patterson's Health Conditions

Mr. Patterson has experienced chronic asthma and GERD for many years.  *See* dkt. 77 at 5 (Patterson Decl.); dkt. 61-1 at 1 (Medical Records).  In addition, he has been treated for a lump on his eyelid and dermatofibroma, a skin condition that causes itching, pain, and growths on his skin.  Dkt. 77 at 5.  The claims in this case are based on Defendants' treatment of these

---

[1] The Court uses Defendants' spelling of the names Rajoli, Wolfe, and Pangallo, and Defendants' description of Centurion's corporate title, Centurion Health of Indiana, rather than the different versions used by Mr. Patterson.

conditions while Centurion was the contracted medical provider for the IDOC. At that time, Mr. Patterson had prescriptions for Pepcid (famotidine), Singulair (montelukast), a Xopenex (levalbuterol) rescue inhaler, artificial tears, and benzoyl peroxide gel.  Dkt. 61-2 at 1 (Medication Administration Record).

### C. Appointment with Dr. Rajoli

The medical records reflect that during an appointment on March 24, 2021, Dr. Rajoli addressed Mr. Patterson's asthma and GERD, noting that his GERD occurs randomly and is aggravated by hot liquids, large meals, spicy foods, and laying down.  Dkt. 61-1 at 1.  Mr. Patterson received a new 30-day supply of Pepcid on July 14, 2021, and another 30-day supply on August 10, 2021.  Dkt. 61-2 at 1, 4.  His prescription for Pepcid refills was effective through August 24, 2021.  *See id.*

After Centurion took over, Mr. Patterson saw Dr. Rajoli in the chronic care clinic on September 8, 2021.  Dkt. 61-1 at 5–7.  The parties disagree regarding what happened at this visit.  Dr. Rajoli noted only asthma as a "present illness" and continued Mr. Patterson's prescriptions to treat asthma, Singulair and the rescue inhaler (albuterol sulfate), through March 5, 2022. Dkt. 61-1 at 7.  During this visit, Dr. Rajoli's notes further reflect that he "advised [Mr. Patterson] about the renewal process for medications," to which Mr. Patterson "voiced understanding."  *Id.*  Dr. Rajoli's notes reflect no symptoms or discussion of GERD or other health concerns during this visit. *Id.* at 5–7.

Mr. Patterson contends that he told Dr. Rajoli he was due for refills of additional prescriptions for an eye condition and a skin condition.  Dkt. 77 at 6.

### D. Requests for Medication and Doctor Visit

Mr. Patterson submitted an HCR on October 9, 2021, asking for a refill of his GERD medication, skin ointment, asthma medication, and eye drops.  Dkt. 44-1 at 33 (exhibit attached to Mr. Patterson's complaint).  This HCR is not listed in Defendants' Statement of Material Facts Not in Dispute.  Dkt. 62 at 4 (narrative of facts related to Mr. Patterson's medical history skipping from September 8, 2021, visit with Dr. Rajoli to Chronic Care Clinic visit on October 14, 2021).  Nurse Wolfe responded that he should sign up for sick call.  Dkt. 44-1 at 33.

Mr. Patterson submitted another HCR on October 14, 2021, requesting an eye doctor visit for "eye medications due to pain in my right eye" and to obtain "a pair of eyeglass frames" to replace his existing pair, which he could not adequately repair after the arms became disconnected.  Dkt. 61-3 at 1.  He was scheduled for an appointment.  *Id.*  Mr. Patterson also submitted another HCR that day asking for refills of this asthma, GERD, dermatofibroma, and eye medications.  Dkt. 44-1 at 34.  Ms. Roberts responded, "Singulair sent for, Inhaler sent for."  *Id.*

Mr. Patterson presented for sick call on November 1, but was told that his appointment was rescheduled because of a shortage of medical staff.  Dkt. 77 at 7 (Patterson Declaration).  This is not referenced in Defendants'

Statement of Material Facts Not in Dispute.  Dkt. 62 at 4–5 (skipping from October 14 HCR to November 18 HCR).

On the afternoon of November 5, 2021, Mr. Patterson vomited blood on his cell floor and notified Nurse Pangallo that he needed his GERD medication. Dkt. 77 at 7.  He also asked her for his eye drops and ointment.  *Id.*  Mr. Patterson attested that Ms. Pangallo promised to provide him with his medications but did not do so and did not schedule him to see a provider.  *Id.*

Mr. Patterson asked Nurse Taylor for his medications on November 6 and 7 and he also asked for medical visit, but she did not assist him.  *Id.* at 8.

Mr. Patterson reported to medical on November 8, told Officer Michaels that he was "in extreme pain," and asked to see a doctor.  *Id.*  Officer Michaels told him that he would not be able to see a doctor because of a staffing shortage.  *Id.*

Mr. Patterson submitted an HCR on November 18 asking for his medications.  Dkt. 61-3 at 2.  That form stated "GERD, Dermatofibroma, RLD complications, need inhaler, and all other automatic refill medications."  *Id.*  At that time, Mr. Patterson's albuterol inhaler was the only active prescription with an automatic refill, with a stop date of March 5, 2022.  Dkt. 61-2 at 8. Mr. Patterson received one-month supplies of Singulair on October 22 and November 17.  *Id.* at 6, 8.  Ms. Roberts responded to his request that he had to see the doctor to receive Singulair and there were no other orders at this time. Dkt. 61-3 at 2.

Mr. Patterson went to the medical desk again on November 23, and asked Officer Michaels to see the doctor.  Dkt. 77 at 9.

Mr. Patterson submitted an HCR the next day, stating: "I am not being provided my medications or being allowed to attend sick call due to staff shortages.  I have filed multiple request[s] within the past (35) days so you are well aware of my serious medical conditions.  The information is contained in the Electronic Medical Record (EMR)."  Dkt. 61-3 at 3.  Mr. Patterson's EMR reflected two active prescriptions with refills current on both as of November 24, 2021, and Ms. Wolfe responded that he had current orders for albuterol and Singular.  *Id.*

On November 25, 2021, Mr. Patterson filed a grievance contending that he was not being provided his prescription medications or allowed to attend sick call to see a provider concerning these issues.  Dkt. 44-1 at 1.  Ms. Hobson responded to the grievance stating "Singular was short term order.  MD notified when needed new orders.  Albuterol was filled on 6/30, 10/22, and 11/23 which is current with orders."  *Id.* at 3.

On December 6, 2021, Mr. Patterson again went to the medical desk asking to see a provider but was denied.  Dkt. 77 at 10.

**E. Appointment with Optometrist**

On December 8, 2021, Mr. Patterson saw optometrist Dr. Lewton.  Dkt. 61-4 at 1.  Dr. Lewton noted Mr. Patterson's history of bumps on his eyelid and that the condition appeared to have recurred.  *Id.*  Dr. Lewton ordered doxycline and eye drops.  *Id.*

7

On December 14, 2021, Mr. Patterson submitted an HCR, stating:

> I need my dermatofibroma medication; my medication for GERD and RLD are automatic refill medications. I have requested refill, renewal, and to see the doctor for months regarding these issues. I have informed you of my continued pain resulting from being denied my medications. All you people do is reply or state I need to see the doctor but refuse to schedule me to see the doctor. This is deliberate indifference to my serious medical needs.

Dkt. 61-3 at 5.  Mr. Patterson's Singulair prescription was renewed the next day.  Dkt. 61-2 at 10.

When he was picking up medications on December 10, he asked for his albuterol inhaler, but he did not receive it until December 23.  Dkt. 77 at 11.

### F. Continued Requests for Care

On December 16, 2021, Mr. Patterson saw Nurse Wolfe in nursing sick call.[2]  Dkt. 61-1 at 9.  Mr. Patterson states she took no action and told him she did not want to deal with his request because he sued her, dkt. 77 at 11, while Nurse Wolfe noted that Mr. Patterson refused to see her and would only see a doctor, dkt. 61-1 at 9.

On January 5, 2022, Mr. Patterson submitted another HCR, stating, "Please refill my: Xopenex inhaler for asthma; montelukast for restricted lung disease, famotidine for GERD, triamcinolone for dermatofibroma, eye drops and neopoly/dexamet for eye condition.  I am all out of my automatic refill meds and am in pain all day, daily, please help me."  Dkt. 61-3 at 6.  Ms. Roberts responded, "request sent."  *Id.*

---

[2] Mr. Patterson states that he saw her on December 17, but the medical record reflects that this appointment took place on December 16.  Dkt. 61-1 at 9.  The Court understands the parties to refer to the same appointment.

On the evening of January 7, 2022, Mr. Patterson told Officer Schick that he was not receiving his medication and Officer Schick called for him to go to the prison infirmary because of a reaction he was having.  Dkt. 77 at 11.

On January 12, 2022, Mr. Patterson saw Nurse Auler in sick call and she examined the bumps on his skin and requested triamcinolone cream, Singulair, Pepcid, and a new rescue inhaler.  Dkt. 61-1 at 11.  Nurse Auler contacted Dr. Byrd, who ordered new prescriptions for triamcinolone and Pepcid.  *Id.* at 11–12.  In addition, refill requests for Singulair and a new rescue inhaler were placed through the pharmacy.  *Id.*

Mr. Patterson received Singulair on January 14 and 18, his inhaler on January 21 and 24, and Pepcid and triamcinolone cream on January 19.  Dkt. 61-2 at 12.  He received an additional month-supply of Pepcid on February 21, March 10, April 5, and May 6, 2021, and a triamcinolone refill on March 24.  *Id.* at 13, 15, 17, 19.

On January 20, 2022, Mr. Patterson submitted another HCR, indicating that the red bumps on his body had worsened and spread.  Dkt. 61-3 at 8.  On January 24, 2022, Nurse Auler saw him to reexamine the skin condition.  Dkt. 61-1 at 13.  She noted multiple areas of red, rash-like bumps and nodules on the back, abdomen, chest, torso, hips, and upper thighs.  *Id.* at 14.  Mr. Patterson claimed that the triamcinolone was not working.  *Id.* at 15.  Nurse Auler discussed the case with Dr. Byrd, and they agreed to schedule Mr. Patterson for a clinic visit and further treatment.  *Id.*  Mr. Patterson asserts

that Nurse Firestone was responsible for scheduling this appointment.  Dkt. 77 at 13.

On February 11, 2022, Mr. Patterson requested an emergency medical visit, after the rash continued to spread and began to burn and itch.  Dkt. 61-1 at 16.  The on-duty nurse examined Mr. Patterson and contacted Dr. Byrd to report the worsening symptoms.  *Id.* at 17–18.  Dr. Byrd ordered a dose of Benadryl, which the nurse administered, to provide Mr. Patterson relief.  *Id.* The nurse informed Mr. Patterson that Dr. Byrd would follow up.  *Id.* at 19.

On February 21, Dr. Byrd renewed Mr. Patterson's rescue inhaler, Singulair, Pepcid, and triamcinolone prescriptions.  Dkt. 61-1 at 20.  Mr. Patterson saw Ms. Roberts that day when he was picking up his medication. Dkt. 77 at 13.  He told her that he was past due for his triamcinolone cream, and that he had been to medical twice and was experiencing more issues with his skin.  *Id.*  Ms. Roberts told him that "this treatment is acceptable to us because that's the way it is."  *Id.*  She further stated, "You already have lawsuits against all of us anyway so who cares when you get your medication, or if it's acceptable now" and refused to provide him with his skin medications. *Id.*

On February 24, WVCF posted an email stating that on March 4–11, the south gym would be closed because of backlogged medical appointments caused by the recent surge in the pandemic.  *Id.* at 14.

On March 17, 2022, Mr. Patterson submitted an HCR requesting more triamcinolone "and all eye medications/artificial tears," stating that he had

verbally requested these medications several times, but did not receive them. Dkt. 61-3 at 9.  Nurse Auler replied to Mr. Patterson's request on March 21, noting that she had requested a triamcinolone refill but that he did not have an active prescription for artificial tears because it expired in September of 2021. *Id.*

### G. Ophthalmologist Appointment

On April 6, 2022, Mr. Patterson submitted an HCR, complaining of "a serious eye condition regarding a foreign particle being in my right eye for over 2 years." Dkt. 61-3 at 10.  Mr. Patterson had a follow-up appointment with Dr. Lewton on April 20, where he reported a "very small lump next to his right eye," that caused pain that Mr. Patterson rated at 7/10. Dkt. 61-4 at 2.  Dr. Lewton concluded that the small bump was a neoplasm (abnormal growth of tissue) and agreed to provide Mr. Patterson an outside ophthalmology referral since "[s]everal topical and oral treatments have been attempted" without resolution. *Id.*; dkt. 61-1 at 22–24.  Dr. Lewton submitted a referral request and Mr. Patterson was scheduled for a consult.  Dkt. 61-1 at 25.

Mr. Patterson had his outside ophthalmology appointment on May 2. Dkt. 61-4 at 3.  The ophthalmologist noted "no signs of infection or inflammation" but suggested a possible CT and neuro consultation if his symptoms persisted.  *Id.*  Mr. Patterson had a follow-up with Dr. Lewton on May 11.  *Id.* at 4.  He reported continuing pain, and Dr. Lewton contacted Dr. Byrd to determine whether Mr. Patterson would be referred to a neurologist for further evaluation.  Dkt. 61-5 (Emails).  Dr. Byrd responded, noting that he

had difficulty reading the ophthalmologist's handwritten report but that he would have no problem approving an additional consult if someone could assist in interpreting the ophthalmology report to identify a supporting diagnosis. *Id.*

On June 8, Dr. Byrd requested an outpatient CT of Mr. Patterson's eye area, explaining that the ophthalmologist saw no foreign body and "recommended observation vs. CT. vs. neurology consult." Dkt. 61-1 at 26–28. Dr. Byrd also detailed Dr. Lewton's reports of multiple failed attempts at treatment with topical medication. *Id.* Dr. Byrd's request was approved, and Mr. Patterson was scheduled for CT scans at Terre Haute Regional Hospital on July 7, 2022. *Id.* at 29. The results of the scan were normal except that "there continues to be a punctate, approximately 1 mm, area of density just anterior to lateral orbital wall in the soft tissues . . . . This likely represents a small calcification. Foreign body is not entirely excluded . . . . This is of doubtful clinical significance." Dkt. 61-4 at 5. The radiologist concluded there was "no change in probable tiny calcification in the soft tissues anterior to the orbit" with no further concerns or treatment recommendations. *Id.*

### III.
### Discussion

Mr. Patterson alleges that the defendants were deliberately indifferent to his chronic medical conditions. He also alleges that Ms. Roberts retaliated against him for filing lawsuits by providing inadequate medical care.

#### A. Deliberate Indifference

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth

Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need."  *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021).  "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'"  *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

Deliberate indifference requires more than negligence or even objective recklessness.  *Id.*  Rather, Mr. Patterson "must provide evidence that an official actually knew of and disregarded a substantial risk of harm."  *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).  "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment.  So in many cases, deliberate indifference must be inferred from the propriety of their actions."  *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (internal citations omitted).  Among other things, the Seventh Circuit has held that deliberate indifference occurs when the defendant renders a treatment decision that departs so substantially "from accepted professional judgment, practice, or standards as to demonstrate that" it is not based on judgment at all.  *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

Defendants do not dispute that Mr. Patterson's medical conditions were objectively serious, but only that they were not deliberately indifferent to those conditions. Mr. Patterson must designate evidence that would allow a reasonable jury to conclude that each of the defendants acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Mr. Patterson]'s health." *Dean*, 18 F.4th at 241 (cleaned up).

Defendants argue that only Dr. Rajoli, Dr. Byrd, and Ms. Wolfe were personally involved in Mr. Patterson's care, so all other defendants are entitled to summary judgment. Defendants further argue that they were not deliberately indifferent to Mr. Patterson's serious medical needs and the care Mr. Patterson received was based on medical decisions. Defendants also argue that Mr. Patterson mistakenly thought that once he was prescribed a medication, he was entitled to have it continually refilled. He did not understand that medications are prescribed for only a limited time on an as-needed basis and once that timeframe has passed, a new prescription from a physician is necessary for further refills. So, for example, at Mr. Patterson's March 2021 appointment, Dr. Rajoli prescribed Pepcid only through August 2021. Similarly, Mr. Patterson's prescriptions for skin cream and eye medication were for a limited time and were not re-prescribed because they were not necessary.

Mr. Patterson argues that these prescriptions should have been renewed, and that at his September 2021 chronic care visit he asked Dr. Rajoli for medication to treat GERD as well as his skin and eye conditions. He further

contends that he continued to ask for refills of these medications and to be seen by a doctor, but those requests were regularly denied.[3]

The Court will address these arguments as they relate to each defendant.

### 1. Dr. Rajoli

Dr. Rajoli treated Mr. Patterson both before and after Centurion became the medical services provider. Before Centurion took over, Dr. Rajoli treated Mr. Patterson for asthma and GERD, with GERD being "a chronic, but not constant condition." Dkt. 62 at 15. Defendants argue that at the September 8, 2021, chronic care appointment, the first since Centurion took over, Mr. Patterson only discussed asthma with Dr. Rajoli. Dkt. 61-1 at 7. Defendants designate Dr. Rajoli's notes which record only asthma as a "present illness" and do not reflect any symptoms or discussion of GERD or any other health conditions. *Id.* at 5–7. Therefore, Dr. Rajoli continued only Mr. Patterson's prescriptions to treat asthma, Singulair and the rescue inhaler (albuterol sulfate), and did not continue the prescription for Pepcid, which had expired. Dkt. 61-1 at 7. Further, Dr. Rajoli's notes reflect he discussed with Mr. Patterson the "renewal process for medications." *Id.* This account of the September 8 chronic care visit is supported by Defendants' designated evidence.

---

[3] Mr. Patterson also argues that each of the defendants was aware of Health Care Service Directives and that those Directives required them to provide particular treatment, but, as discussed below, the question is whether each individual defendant was aware that Mr. Patterson was experiencing a serious medical need and disregarded it. Accordingly, the Court focuses on each of the defendants' knowledge of his conditions.

Mr. Patterson attests, however, that at the September 8 chronic care visit, he "spoke to Dr. Rijoli [sic], verbally requested and informed Rijoli [sic] he was past due to receive his automatic refill Gerd medication famotidine, neopoly/dexamet, and artificial tears for his eye condition; and Triamcinolone acetonide topical steroid for dermatofibroma." Dkt. 77 at 6 ¶ 14. While a jury could credit Mr. Patterson's version of the September 8 visit and find that Mr. Patterson "verbally requested and informed [Dr. Rajoli] he was past due to receive his automatic Gerd medication," Mr. Patterson designates no evidence from which a jury could reasonably find that Dr. Rajoli's decision to not renew the Pepcid prescription departs so substantially "from accepted professional judgment, practice, or standards as to demonstrate that" it is not based on judgment at all. *Petties*, 836 F.3d at 729. Indeed, Mr. Patterson designates no evidence that he told Dr. Rajoli during the September 8 visit that he was experiencing symptoms and/or pain related to GERD, his eye condition, or his skin condition. And Defendants' designated evidence shows that Dr. Rajoli understood from previous chronic care appointments that Mr. Patterson's GERD was "mild-moderate," indicated by gradual heartburn, and treated with lifestyle changes. Dkt. 62 at 2–3. Mr. Patterson's testimony that he informed Dr. Rajoli that he "was past due to receive his automatic refill" of medications does not support an inference of deliberate indifference. In the absence of evidence that Dr. Rajoli "actually knew of and disregarded a substantial risk of harm," *Petties*, 836 F.3d at 728, no reasonable jury could find that Dr. Rajoli was deliberately indifferent.

16

Dr. Rajoli is entitled to summary judgment.

### 2. Kim Hobson

Defendants argue that Ms. Hobson was not personally involved with Mr. Patterson's care and is therefore entitled to summary judgment. The designated evidence shows that her direct involvement during the time at issue was responding to a grievance Mr. Patterson filed on November 25, 2021, contending that he was not being provided his prescription medications or allowed to attend sick call to see a provider concerning his issues despite having filed multiple HCRs. Dkt. 44-1 at 1. Ms. Hobson responded to the grievance stating "Singulair was short term order. MD notified when needed new orders. Albuterol was filled on 6/30, 10/22, and 11/23 which is current with orders." *Id.* at 3. While Mr. Patterson contends that Ms. Hobson could have verified his prescription, the record reflects that Singulair and albuterol were Mr. Patterson's only active prescriptions at this time. Dkt. 61-2 at 8.

But Mr. Patterson also stated in that grievance that he had been trying to attend sick call to see a provider and had submitted several HCRs regarding his concerns. Dkt. 44-1 at 1. These include his October 9 HCR asking for a refill of his GERD medication, skin ointment, asthma medication, and eye drops, dkt. 44-1 at 33, his two October 14 HCRs asking to see an eye doctor, dkt. 61-3 at 1, and asking for refills of his asthma, GERD, dermatofibroma, and eye medication, dkt. 44-1 at 34, and his November 18 HCR asking for GERD, dermatofibroma, and other medications, dkt. 61-3 at 2. Viewed in a light most favorable to Mr. Patterson, a jury could find that Ms. Hobson

17

disregarded Mr. Patterson's multiple requests to see a doctor. *See Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015) ("Nurses, like physicians, may [] be held liable for deliberate indifference where they knowingly disregard a risk to an inmate's health."). A reasonable jury therefore could conclude that Ms. Hobson was aware of Mr. Patterson's serious medical needs but disregarded them, so she is not entitled to summary judgment.

### 3. Nurse Lesa Wolfe

Nurse Wolfe mostly interacted with Mr. Patterson through her responses to his HCRs. Mr. Patterson submitted an HCR on October 9, 2021, asking for a refill of his GERD medication, skin ointment, asthma medication, and eye drops. Dkt. 44-1 at 33. Nurse Wolfe responded that he should sign up for sick call. *Id.*

Over a month later, Mr. Patterson submitted an HCR on November 24, 2021, stating: "I am not being provided my medications or being allowed to attend sick call due to staff shortages. I have filed multiple request[s] within the past (35) days so you are well aware of my serious medical conditions. The information is contained in the Electronic Medical Record (EMR)." Dkt. 61-3 at 3. Ms. Wolfe responded that he had current orders for albuterol and Singular. *Id.* But the evidence viewed most favorably to Mr. Patterson shows that Ms. Wolfe knew of his need to attend sick call for "serious medical conditions" yet hadn't been able to have an appointment with medical staff.

Mr. Patterson has also presented evidence that Nurse Wolfe disregarded his needs. Specifically, when Mr. Patterson saw Nurse Wolfe in nursing sick

call on December 16, he states she took no action and told him she did not want to deal with his request because he sued her, dkt. 77 at 11.  Nurse Wolfe stated that Mr. Patterson refused to see her and would only see a doctor, dkt. 61-1 at 9.  From this evidence, a reasonable jury could credit Mr. Patterson's testimony and conclude that he had presented to Nurse Wolfe with serious medical needs which she flatly disregarded.  *See Perez*, 792 F.3d at 779.  Ms. Wolfe is therefore not entitled to summary judgment.

### 4. Ms. Roberts

Mr. Patterson interacted with Ms. Roberts principally through his HCRs. Mr. Patterson submitted an HCR on October 14, 2021, asking for refills of his asthma, GERD, dermatofibroma, and eye medications.  Dkt. 44-1 at 34.  Ms. Roberts responded, "Singular and inhaler sent for."  *Id.*  Mr. Patterson then submitted another HCR on November 18 stating: "GERD, Dermatofibroma, RLD complications, need inhaler, and all other automatic refill medications." Dkt. 61-3 at 2.  At that time, Mr. Patterson's albuterol inhaler was the only active prescription with an automatic refill.  Dkt. 61-2 at 8.  Ms. Roberts responded to his request that he had to see the doctor to receive Singulair and there were no other orders at this time.  Dkt. 61-3 at 2.  Mr. Patterson submitted another HCR on January 5, 2022, stating, "Please refill my: Xopenex inhaler for asthma; montelukast for restricted lung disease, famotidine for GERD, triamcinolone for dermatofibroma, eye drops and neopoly/dexamet for eye condition.  I am all out of my automatic refill meds and am in pain all day,

daily, please help me." Dkt. 61-3 at 5.  Ms. Roberts responded, "request sent." *Id.*

Mr. Patterson saw Ms. Roberts the next day when he was picking up medication and told Ms. Roberts that he was past due for his triamcinolone cream, that he had been to medical twice, and that he was experiencing more issues with his skin.  Dkt. 77 at 13.  Ms. Roberts told him that "this treatment is acceptable to us because that's the way it is." *Id.*  She further stated, "You already have lawsuits against all of us anyway so who cares when you get your medication, or if it's acceptable now" and refused to provide him with his skin medications. *Id.*

A reasonable jury that believed Mr. Patterson's account that he complained to Ms. Roberts of his medical concerns, and she denied him attention because he has filed a lawsuit, could conclude that she made decisions about his complaints that were not based on medical judgment.  Ms. Roberts therefore is not entitled to summary judgment.

### 5. Dr. Byrd

The record does not reflect that Dr. Byrd had any direct contact with Mr. Patterson during the relevant time.  Instead, Dr. Byrd was called on to provide direction by other medical staff.  First, when Nurse Auler examined the bumps on Mr. Patterson's skin and considered his GERD complaints, she contacted Dr. Byrd, who ordered new prescriptions for triamcinolone and Pepcid.  Dkt. 61-1 at 12.  When she saw him again on January 24 for his skin condition, she discussed the case with Dr. Byrd, and they agreed to schedule Mr. Patterson

20

for a clinic visit. *Id.* at 15. When he had an emergency visit because his symptoms were still getting worse, the nurse contacted Dr. Byrd who ordered Benadryl. *Id.* at 19. In addition, after Mr. Patterson saw an ophthalmologist who recommended a CT scan for his eye, dkt. 61-4 at 3, Dr. Byrd requested an outpatient CT of Mr. Patterson's orbital area. Dkt. 61-1 at 26–28. Mr. Patterson underwent the CT scan and there, while a lump was identified, there were no treatment recommendations. *Id.*

The designated evidence shows that on instances when Dr. Byrd was made aware of Mr. Patterson's medical concerns, he responded by ordering or requesting specific treatment. While it appears that Dr. Byrd agreed on January 24 that Mr. Patterson should have a doctor visit for his skin condition, there is no evidence that Dr. Byrd was responsible for scheduling this appointment or knew that it had not been timely scheduled. There is thus no evidence that Dr. Byrd was aware of any serious medical need that he disregarded.

Mr. Patterson appears to argue that Dr. Byrd, as the medical director for WVCF, should have been aware of or should be responsible for all alleged failures to treat him by other medical staff. But Mr. Patterson has presented no direct evidence that Dr. Byrd was aware of these alleged failures. His supervisory role is insufficient to make him liable for the actions of other medical personnel. *See Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). Dr. Byrd is therefore entitled to summary judgment.

21

### 6. Nurse Taylor

Nurse Taylor interacted with Mr. Patterson on November 6 and 7, 2021, when he asked her for his prescription medications because he was past due to receive his refills of Pepcid, eye ointment, and skin cream. Dkt. 77 at 8. According to Mr. Patterson, Nurse Taylor looked at his paperwork and promised to provide him his medications but failed to do so. *Id.* At the time, however, Mr. Patterson only had active prescriptions for Singulair and his rescue inhaler. Dkt. 61-2 at 8.

Mr. Patterson also alleges, however, that he informed Nurse Taylor that he needed to see a doctor, that he was in pain, and that Nurse Taylor did nothing in response. Dkt. 77 at 8. Viewing this evidence in a light most favorable to Mr. Patterson, a jury could find that Nurse Taylor knew that Mr. Patterson was in pain and wanted to see a doctor yet did not take any steps to treat or facilitate treatment of Mr. Patterson. "Nurses . . . may [] be held liable for deliberate indifference where they knowingly disregard a risk to an inmate's health." *Perez*, 792 F.3d at 779. Nurse Taylor is therefore not entitled to summary judgment.

### 7. Nurse Firestone

Mr. Patterson contends that Nurse Firestone failed to schedule him to see a doctor when he was seen in nursing sick call on January 24 for his skin condition. Mr. Patterson saw Nurse Auler that day and she noted multiple areas of red, rash-like bumps and nodules on his skin. Dkt. 61-1 at 13. Mr. Patterson claimed that the triamcinolone was not working. *Id.* at 14. Nurse

22

Auler discussed the case with Dr. Byrd, and they agreed to schedule Mr. Patterson for a clinic visit and further treatment. *Id.* at 15. Mr. Patterson asserts that Nurse Auler told him that Nurse Firestone was responsible for scheduling the appointment. Dkt. 77 at 13. And there is no record that Mr. Patterson had any scheduled appointment after his January 24 nurse visit. Indeed, Mr. Patterson was next seen for his skin condition on February 11 for emergency treatment because his rash had spread and began to burn and itch. Dkt. 61-1 at 16.

Mr. Patterson designates no evidence, however, that Nurse Firestone knew of Mr. Patterson's condition or that he was experiencing pain as a result of that condition. Therefore, there is no evidence that would allow a jury to find that Nurse Firestone "actually knew of and disregarded a substantial risk of harm," *Petties*, 836 F.3d at 728. Nurse Firestone is entitled to summary judgment.

### 8. Nurse Pangallo

Mr. Patterson describes one interaction with Nurse Pangallo, when, on the afternoon of November 5, 2021, he vomited blood on his cell floor and notified Nurse Pangallo that he needed his GERD medication. Dkt. 77 at 7–8. He also asked her for his eye drops and ointment. *Id.* Mr. Patterson states that Nurse Pangallo promised to provide him with his medications but did not do so and did not schedule him to see a provider. *Id.*

Mr. Patterson has designated evidence that Nurse Pangallo was made aware that he was experiencing an urgent need when she observed that he had

23

vomited blood. A reasonable jury that believed Mr. Patterson's testimony might conclude that this observation made her aware that he needed prompt medical attention and that, by not assisting him, she disregarded that need. *See Gayton v. McCoy*, 593 F.3d 610, 623–24 (7th Cir. 2010) (concluding that nurse was not entitled to summary judgment where she refused to see or treat inmate even after concerned guards brought her a bag of the inmate's vomit). Nurse Pangallo therefore is not entitled to summary judgment.

### 9. Iva Shorter

Mr. Patterson contends that Ms. Shorter is responsible for scheduling sick call appointments and she was deliberately indifferent to his serious medical needs when she failed to ensure that he was able to see a doctor when needed. While Mr. Patterson has designated evidence that Ms. Shorter was responsible for scheduling sick call appointments, dkt. 77 at 176 (Defs. Interrog. Resp.), he has not designated evidence that Ms. Shorter was personally aware that he was seeking medical treatment or needed an appointment and then failed to schedule one. There is therefore no evidence that Ms. Shorter was personally involved in Mr. Patterson's care. *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) ("[I]ndividual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation."). She is therefore entitled to summary judgment.

### 10. Centurion

Defendants argue that Centurion is entitled to summary judgment because Mr. Patterson designates no evidence to support a *Monell* claim.

24

Private corporations acting under color of state law—including those that contract with the state to provide essential services to prisoners—are treated as municipalities for purposes of Section 1983 and can be sued when their actions violate the Constitution. *Dean*, 18 F.4th at 235 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).

Municipal liability for a § 1983 claim must be premised on actions of the entity—an entity cannot be vicariously liable for actions of its agents or employees. *Bohanon v. City of Indianapolis*, 46 F.4th 669, 675 (7th Cir. 2022). So, to prevail on a 42 U.S.C. § 1983 claim against a private entity acting under color of state law like Centurion, "a plaintiff must ultimately prove three elements: (1) an action pursuant to a [corporate] policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the [company] action was the 'moving force' behind the constitutional injury." *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020); *see generally Monell*, 436 U.S. 658. The plaintiff "must show that the policy or custom demonstrates municipal fault." *Bohanon*, 46 F.3d at 675 (citations omitted).

Here, in support of his claim against Centurion, Mr. Patterson asserts that he was denied several sick call appointments because of staffing shortages and was subjected to delays in receiving medications. Dkt. 77 at 7–9, 14. He makes generalized statements that "Centurion knew" he was "experiencing a continuing, systemic practice of deprivation, and excessive delays in providing doctor visits, doctor ordered prescription refills, medical procedures, medical

treatments, concerning his well-documented chronic illnesses . . . ." *Id.* at 14 ¶ 50.  He further cites "an email on the offender tablets stating "March, 4 – March, 11 [sic] the south gym will be closed.  This is due to the facility addressing back logged medical appointments caused by recent surge in the pandemic." *Id.* at 14.

Defendants argue that Mr. Patterson's designated evidence does not show the existence of an unconstitutional practice or policy, and that Mr. Patterson's claim against Centurion is an attempt to hold Centurion vicariously liable for the actions of its employees.  Dkt. 62 at 20–22.

At bottom, Mr. Patterson's complaints are based on delays in getting medical appointments and receiving medications, and his allegations about Centurion are generic and conclusory.  Dkt. 77 at 14 ¶ 51; dkt. 44-1 at 52.  The allegation about the south gym being closed because of "the facility addressing back logged medical appointments caused by recent surge in the pandemic," dkt. 77 at 14 ¶ 48, reflects a single instance of Centurion managing extenuating circumstances.  The fact that Centurion struggled and had to adjust its operations to deliver services during the COVID pandemic does not "prove that it was obvious that [Centurion]'s action would lead to constitutional violations and that [Centurion] consciously disregarded those consequences." *Bohanon*, 46 F.3d at 675–76 (citations omitted).  Mr. Patterson has not designated evidence from which a jury could find that the three elements required for a *Monell* claim—policy or custom, municipal fault, and "moving force" causation—are met, or that Centurion acted with deliberate indifference

26

to his constitutional rights.  Centurion is therefore entitled to summary judgment.

## B. Retaliation

Mr. Patterson also alleges that Ms. Roberts retaliated against him for filing lawsuits by denying him care.  Specifically, he alleges that she refused to provide him with triamcinolone to treat his dermatofibroma, despite Mr. Patterson having told her that he was in pain and needed it.  Dkt. 77 at 13 ¶ 47.  He further states that in conjunction with refusing to give him that medication, she referenced a federal lawsuit that he had pending at the time, stating "You already have lawsuits against all of us anyway so who cares when you get your medication, or if it's acceptable now."  *Id.*  She also said, "you'll get it when you get it" and delayed providing him with that medication for several days.  *Id.*

To succeed on a First Amendment retaliation claim, a plaintiff must designate evidence to allow a reasonable jury to conclude that: (1) the plaintiff engaged in protected First Amendment activity; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) the protected activity was a motivating factor in the defendants' decision to take the allegedly retaliatory action.  *Taylor v. Van Lanen*, 27 F.4th 1280, 1284 (7th Cir. 2022).  If he does so, the burden shifts to the defendants to show that the deprivation would have occurred even if he had not engaged in protected activity.  *Manuel v. Nalley*, 966 F.3d 668, 680 (7th Cir. 2020).  If they can make that showing,

the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual or dishonest.  *Id.*

While Ms. Roberts seeks summary judgment on this claim, she does not develop an argument other than stating there is no evidence that she was personally involved in any decisions regarding Mr. Patterson's care and therefore could not have retaliated against him.  But in a sworn statement, Mr. Patterson states that Ms. Roberts was one of the medical personnel responsible for providing him with his self-carry medications, and intentionally delayed providing him with his medications.  Dkt. 77 at 13 ¶ 47.  Accordingly, there is a dispute of fact regarding whether Ms. Roberts had any personal involvement in Mr. Patterson's care, so the Court will address the retaliation claim.

Ms. Roberts does not dispute that Mr. Patterson engaged in protected First Amendment activity by filing lawsuits, so the Court focuses on the second and third elements.

### 1. Deprivation Likely to Deter Future First Amendment Activity

Whether allegedly retaliatory conduct would "deter a person of ordinary firmness" from exercising his First Amendment rights is an objective test, *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020), and the standard "does not hinge on the personal experience of the plaintiff," *Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020).  Here, Mr. Patterson contends that Ms. Roberts denied him medical care because of his lawsuit.  This is enough to allege a deprivation likely to deter First Amendment activity.  *Perez*, 792 F.3d at 783.

28

### 2. Motivating Factor

Next, "[t]he motivating factor [element] amounts to a causal link between the activity and the unlawful retaliation." *Manuel*, 966 F.3d at 680.  This element may be proven by circumstantial evidence, which may include suspicious timing; ambiguous statements, behavior, or comments directed at others in the protected group; evidence that similarly situated people were treated differently; and evidence that the decisionmaker offered a pretextual reason for an allegedly retaliatory action.  *Id.*; *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643–44 (7th Cir. 2013).  Nonetheless, "[a]llegedly protected speech cannot be proven to motivate retaliation, if there is no evidence that the defendants knew of the protected speech." *Stagman v. Ryan*, 176 F.3d 986, 999–1000 (7th Cir. 1999).

Here, Mr. Patterson asserts that Ms. Roberts told him she was not going to treat him because of his lawsuit.  This is direct evidence that she denied him care because of his lawsuit, and Ms. Roberts has not come forward with any other reason for her actions.  She is therefore not entitled to summary judgment on his retaliation claim.

### IV.
### Conclusion

The defendants' motion for summary judgment, dkt. [60], is **GRANTED IN PART AND DENIED IN PART**.  The motion is **GRANTED** as to Mr. Patterson's claims against Defendants Rajoli, Byrd, Firestone, Shorter, and Centurion.  The **clerk shall terminate** these defendants on the docket.  The motion is **DENIED** as to Mr. Patterson's claims against Defendants Hobson,

Wolfe, Roberts, Taylor, and Pangallo.  These claims shall proceed to settlement negotiations or trial if one is necessary.

The **clerk shall amend the docket** to replace "Rijoli" with "Rajoli", "Wolf" with "Wolfe", "Pangalio" with Pangallo, and "Centurion Health Services" with "Centurion Health of Indiana, LLC."

The **clerk shall include** a form motion for appointment of counsel with Mr. Patterson's copy of this Order.  If Mr. Patterson wishes to ask the Court to attempt to recruit counsel to represent him, he should fill out this form and return it by **December 31, 2024**.

**SO ORDERED.**

Date: 12/4/2024

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

DEAUNDRA PATTERSON
197951
WABASH VALLEY – CF
Wabash Valley Correctional Facility
Electronic Service Participant – Court Only

All electronically registered counsel